# BROWN & CONNERY, LLP

ATTORNEYS AT LAW

360 HADDON AVENUE

WESTMONT, NEW JERSEY 08108

(856) 854-8900

FAX (856) 858-4967

Susan M. Leming, Esq.
sleming@brownconnery.com

September 18, 2020

**VIA: ECF**

Honorable Freda L. Wolfson, U.S.D.J.
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, NJ 08608

> Re:   *Mark Daniel Hospitality LLC (d/b/a INC) v. AmGUARD Insurance Company*, Civil Action No. 3:20-cv-06772-FLW-TJB

Dear Chief Judge Wolfson:

I represent Defendant AmGUARD Insurance Company.  AmGUARD respectfully submits the enclosed supplemental authority in further support of its fully briefed motion to dismiss the complaint pursuant to Rule 12(b)(6) (Dkt. No. 7) and in opposition to Plaintiff's motion to remand (Dkt. No. 12).  AmGUARD also briefly addresses Plaintiff's supplemental submission from earlier this week (Dkt. No. 22).

On September 16, 2020, the Central District of California granted AmGUARD's Rule 12(b)(6) motion and dismissed with prejudice a policyholder restaurant's claim that sought the same declaration under the same AmGUARD policy form that Plaintiff seeks here:  a declaration that the AmGUARD policy form covered a restaurant's lost income attributable to COVID-19 social-distancing orders.  *See* Ex. A, *Plan Check Downtown III, LLC v. AmGUARD Ins. Co.*, No. 2:20-cv-06954-GW-SK (C.D. Cal. Sept. 16, 2020).   The *Plan Check* court held that government orders that negatively impact profitability do not constitute "direct physical loss of or damage to property," which is the unambiguous trigger for business income coverage under the AmGUARD policy.  *Id.* at *7–8 (reasoning further that the policyholder's interpretation was "not reasonable" because it would constitute "a sweeping expansion of insurance coverage without any manageable bounds" that would include lost income attributable to health codes, curfews and snowstorms).

BROWN & CONNERY, LLP

September 18, 2020
Page 2

       Plaintiff's supplemental submission attached the Western District of Missouri's decision in *Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-cv-03127-SRB, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020). It is distinguishable on two grounds, both of which go to the heart of AmGUARD's pending motion to dismiss. In *Studio 417*, the relevant insurance policy did *not* expressly exclude coverage of any loss caused directly or indirectly by a virus. The AmGUARD policy does. Moreover, the policyholder in *Studio 417* "expressly allege[d] physical contamination" to its salons by COVID-19 virus cells and that the policyholder's loss of income arose from that contamination. *Id.* at *4. Plaintiff here expressly disavows the presence of any virus at its restaurant (Compl. ¶ 20), proceeding instead on the untenable theory that a social-distancing order constitutes "direct physical loss of or damage to property" within the meaning of the Policy.

       Finally, Plaintiff's filing submits in further support of the remand motion three cases from the Eastern and Western Districts of Pennsylvania remanding COVID-19 coverage cases that were styled by policyholders as declaratory judgment actions. AmGUARD respectfully submits that these Pennsylvania decisions were wrongly decided and will not withstand appellate challenge. *See* Ex. B, *Umami Pittsburgh, LLC v. Motorists Comm. Mut. Ins. Co.*, No. 2:20-cv-00999 (W.D. Pa. Sept. 9, 2020) (granting defendant's motion for reconsideration and amendment of remand order and retaining jurisdiction pending appeal); Ex. C, *Dianoia's Eatery, LLC v. Motorists Mut. Ins. Co.*, No. 2:20-cv-00787 (W.D. Pa. Aug. 28, 2020) (moving for reconsideration and amendment of remand order to allow for appeal of order). No court in the District of New Jersey or any other District has applied this line of authority to remand or dismiss a COVID-19 business income coverage case. At least one federal court in a COVID-19 coverage case has rejected the argument. Ex. D, *Café Patachou at Clay Terrace, LLC v. Citizens Ins. Co. of Am.*, No. 1:20-cv-01462, 2020 WL 4592718, at *4 (S.D. Ind. Aug. 11, 2020) ("exceptional circumstances" warranting remand were not present because "the factual circumstances of this case may be novel, but . . . 'State and federal courts . . . have regularly interpreted insurance policies and applied them to specific fact patterns."). The District of New Jersey routinely adjudicates insurance coverage declaratory judgment actions that meet the requirements of 28 U.S.C. § 1332, particularly where, as here, the dispute entails the straightforward application of standard policy language to a specific fact pattern. *See, e.g., Sun Chem. Co. v. Am. Home Assurance Co.*, No. 20-6252, 2020 WL 5406171, at *10 (D.N.J. Sept. 9, 2020) (declining to remand and granting motion to dismiss action seeking declaration of scope of insurance coverage); *Colony Ins. Co. v. Troensa Constr., Inc.*, No. 17-03577, 2018 WL 4676038, at *8–9 (D.N.J. Sept. 28, 2018) (exercising jurisdiction over action seeking declaration of scope of insurance coverage). The Pennsylvania remand cases all rely on *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 149 (3d Cir. 2014), which is readily distinguishable because there, unlike here, the policyholder's claim raised a novel issue of Pennsylvania insurance law: whether a legal malpractice insurer could deny coverage based on the insured's late notice, despite the absence of prejudice to the insurer, where such denial would preclude a recovery by

**BROWN & CONNERY, LLP**

September 18, 2020
Page 3

the insured's, *i.e.*, the negligent lawyer's, client.  *Id.* at 137.  The Third Circuit recognized, however, that this was the rare exception and not the rule:  "we . . . know of no authority for the proposition that an insurer is barred from invoking diversity jurisdiction to bring a declaratory action against an insured on an issue of coverage."  *Id.* at 147 (quoting and citing other Circuits).

We thank the Court for its time and attention to this matter.

Respectfully submitted

**BROWN & CONNERY, LLP**

s/ *Susan M. Leming*

Susan M. Leming

SML/krm
Enclosures
**cc:  All Counsel of Record (via CM/ECF)**

# Exhibit A

**JS-6**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 20-6954-GW-SKx | Date | September 16, 2020 |
|---|---|---|---|
| Title | *Plan Check Downtown III, LLC v. AmGuard Insurance Company, et al.* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:

None Present

Attorneys Present for Defendants:

None Present

**PROCEEDINGS:    IN CHAMBERS - ORDER**


On September 10, 2020, this Court issued a tentative ruling on Defendant's motion to dismiss this lawsuit and entertained oral argument thereon. *See* Docket No. 31. The Court continued the hearing to September 17, 2020. Plaintiff's counsel has now submitted a "Status Report" which indicates that the Plaintiff "accepts dismissal of this action with prejudice." *See* Docket No. 33. Based on that filing, the Court dismisses this action with prejudice.

|  | : |  |
|---|---|---|
| | Initials of Preparer | JG |

1  Kathryn Lee Boyd (SBN 189496)
   lboyd@hechtpartners.com
2  Janine F. Cohen (SBN 203881)
   jcohen@hechtpartners.com
3  Hecht Partners LLP
   125 Park Ave. 25th Floor
4  New York, NY 10017
   Telephone: 212-851-6821
5  Facsimile: 646-492-5111
6

7

8  *Attorneys for Plaintiff Plan Check Downtown*
   *III, LLC, and others similarly situated,*
9

   ## UNITED STATES DISTRICT COURT
10
   ## FOR THE CENTRAL DISTRICT OF CALIFORNIA
11

12 | PLAN CHECK DOWNTOWN III, LLC, a     | Case No: 2:20-cv-06954
   | California limited liability company and |
13 | others similarly situated,           | **STATUS REPORT RE: DISMISSAL**
                                           | **WITH PREJUDICE**
14 |                                      |
   |                     *Plaintiff,*     |
15 |              *v.*                    |
16 |                                      |
   | AMGUARD INSURANCE COMPANY, a         |
17 | Pennsylvania company, and DOES 1 through |
   | 20,                                  |
18 |                                      |
   |                   *Defendants.*      |
19

20

21

22

23

24

25

26

27

28

STATUS REPORT

Pursuant to the Court's decision at the Telephonic Hearing on Defendant's Motion to Dismiss held on September 10, 2020, Plaintiff Plan Check Downtown III, LLC hereby accepts dismissal of this action with prejudice.

Dated: September 15, 2020            Hecht Partners LLP


By: _____
    Kathryn Lee Boyd (SBN 189496)
    lboyd@hechtpartners.com
    125 Park Avenue, 25th Floor
    New York, NY 10017
    Telephone: 212-851-6821
    *Attorneys for Plaintiff Plan Check*
    *Downtown III, LLC, and others*
    *similarly situated,*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 20-6954-GW-SKx | | Date | September 10, 2020 |
|---|---|---|---|---|
| Title | *Plan Check Downtown III, LLC v. AmGuard Insurance Company, et al.* | | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Terri A. Hourigan | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Kathryn L. Boyd<br>Janine F. Cohen | Chet A. Kronenberg |

**PROCEEDINGS:** **TELEPHONIC HEARING ON DEFENDANT'S MOTION TO DISMISS [8]**

The Court's Tentative Ruling is circulated and attached. Court and counsel confer. For reasons stated on the record, the Court continues the motion to September 17, 2020 at 8:30 a.m.

|  | : | 18 |
|---|---|---|
| Initials of Preparer | JG | |

_**Plan Check Downtown III v. AmGuard Insurance Company et al**_; Case No. 2:20-cv-06954-GW-(SKx)
Tentative Ruling on Defendant's Motion to Dismiss

## I.   Background[1]

Like many other restaurateurs across the country, plaintiff Plan Check Downtown III has seen its business suffer greatly since the onset of the ongoing COVID-19 pandemic.  In response to various city- and state-government orders requiring restaurants to suspend on-premise dining and individuals to shelter at home, Plan Check stopped all operations at its two restaurant locations in Los Angeles in March 2020.  Compl. ¶ 43.  While its West Los Angeles location has since reopened for take-out and delivery service, its downtown location remains closed.  _Id._

Prior to these events, Plan Check had purchased a property insurance policy from defendant AmGuard Insurance Company (the "Policy") for its two restaurants.  _Id._ ¶ 14.  The Policy provides coverage for, among other things, loss of business income due to the necessary suspension of business operations due to any "physical loss of or damage to" the covered properties.  _See_ Policy § I.A.5(f).  Plan Check argues that its loss of business income caused by the changes to its operations is covered by the Policy and submitted a claim to AmGuard for reimbursement.  Compl. ¶ 50.  AmGuard rejected the claim, concluding that Plan Check had not suffered a physical loss or damage to its properties and that in any event a "virus exclusion" in the Policy meant that Plan Check's claims were not covered.  _Id._ ¶ 52.

After AmGuard's denied its claim, Plan Check brought this putative class action against AmGuard on behalf of all restaurants in California that purchased comprehensive business insurance coverage from AmGuard.  _Id._ ¶ 64.  Plan Check filed its lawsuit in California state court, alleging a breach of contract and other related claims.  AmGuard removed the case to federal court based on diversity jurisdiction.  _See_ NoR at 2-5.  Before the Court is AmGuard's motion to dismiss for failure to state a claim.

## II.   Legal Standard

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A complaint may be dismissed for failure

---

[1]  The following abbreviations are used for the filings: (1) Notice of Removal ("NoR"), ECF No. 1; (2) Complaint ("Compl."), ECF No. 1-1; (3) Business Owner's Coverage Form ("Policy"), ECF No. 10-1; (4) Defendant's Motion to Dismiss ("Mot."), ECF No. 8; (5) Plaintiff's Opposition to Motion to Dismiss ("Opp."), ECF No. 17; (6) Defendant's Reply in Support of Motion to Dismiss ("Reply"), ECF No. 21.

to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

The court must construe the complaint in the light most favorable to the plaintiff, by accepting all well-pled allegations of material fact as being true, and drawing all reasonable inferences from well-pleaded factual allegations in favor of the plaintiff. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). The court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion, the plaintiff must provide grounds demonstrating its entitlement to relief. *Twombly*, 550 U.S. at 555 (2007). Under the Supreme Court's decisions in *Twombly* and *Iqbal*, this requires that the complaint contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

## III. Discussion

The parties agree that the Policy is governed by California law. *See generally Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.*, 14 Cal.App.4th 637, 718-21 (1993) (principal location of insured risk is most important consideration in determining which state's law applies to insurance policy); Restatement (Second) of Conflict of Laws § 193 (rights created by policy are determined by the local law of the state which the parties understood was to be the principal location of the insured risk).

"When determining whether a particular policy provides a potential for coverage," a court "[is] guided by the principle that interpretation of an insurance policy is a question of law." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 18 (1995). "[A]ny ambiguity or uncertainty in an insurance policy is to be resolved against the insurer and . . . if semantically permissible, the contract will be given such construction as will fairly achieve its object of providing indemnity for the loss to which the insurance relates." *Reserve Ins. Co. v. Pisciotta*, 30 Cal.3d 800, 807 (1982). The purpose is "to protect the insured's reasonable expectation of coverage in a situation in which the insurer-draftsman controls the language of the policy." *Id.* at 808. "Whereas coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured, exclusionary clauses are interpreted narrowly against the insurer." *Id.*

A. The terms of the insurance policy

2

In the Policy, AmGuard promises that "[it] will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." Policy § I.A. It goes on to provide a subsection titled "Additional Coverages," which specifies some covered causes of loss. Relevant here, that section includes:

**Section I – Property**

  A. Coverage

    We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
    * * *

    5. Additional Coverages

      f. Business Income

        . . . We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.' The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.
        * * *

      g. Extra Expense

        (1) We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. . . .
        (2) Extra Expense means expense incurred:
        (a) To avoid or minimize the suspension of business and to continue "operations":
        (i) At the described premises; or (ii) At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.
        (b) To minimize the suspension of business if you cannot continue "operations" . . . .

Policy § I.A.5.f-g. The Policy includes an "Exclusions" section. Relevant here is the following "virus exclusion":

**Section I – Property**

  A. Coverage
    * * *

  B. Exclusions

    1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

      a. Ordinance Or Law
      * * *

      j. Virus or Bacteria.

        (1) Any virus, bacterium or other microorganism that induces or is capable of

3

inducing physical distress, illness or disease.

Policy § I.B.1.j(1).

    B.  <u>Whether Plan Check suffered from any "direct physical loss of or damage to" its properties</u>

The Policy is an "all-risk property" insurance policy[2] that limits its coverage to "direct physical loss of or damage to Covered Property."  Policy § I.A.[3]  The term "physical loss or damage" is typically the trigger for coverage in modern all-risk property insurance policies.  10A <u>Couch on Insurance</u> (3d ed. 2010), § 148:46.  The word "physical" modifies both "loss" and "damage."  Plan Check concedes that its properties did not suffer any "physical damage."  Opp. at 11.  However, the parties do dispute whether Plan Check has suffered a "physical loss."

Neither the words "physical" nor "loss" are defined in the Policy.  When interpreting an insurance policy provision, courts "must give its terms their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage."  *Palmer v. Truck Ins. Exch.*,  21 Cal.4th 1109, 1115 (1999).  Courts must also "interpret these terms in context, and give effect to every part of the policy with each clause helping to interpret the other."  *Id.*

AmGuard focuses on the word "physical."  That the "loss" must be "physical," given the ordinary definition of that word, "is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, *physical alteration of the property*."  *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal.App.4th, 766, 799 (2010) (emphasis added) (quoting <u>Couch on Insurance</u>, § 148.46).  According to AmGuard, the fact that there was no physical alteration to the properties means that Plan Check has not suffered a physical loss of property.

Plan Check, on the other hand, focuses on the word "loss" and the accompanying prepositions.  In particular, it emphasizes the fact that the Policy extends to "physical *loss of* property" or "physical *damage to* property."  Plan Check's main criticism of AmGuard's

---

    [2] An "all-risk" policy is one that covers all losses of the type described unless the loss is specifically excluded. By contrast, a named-perils policy covers only losses attributable to expressly enumerated causes.

    [3] The Policy covers physical loss of or damage to Covered Property "caused by or result from any Covered Cause of Loss."  Policy § I.A.  The Covered Causes of Loss in turn are defined broadly to include all "[r]isks of direct physical loss" unless the loss falls within one of the Policy's exclusions or limitations.

interpretation that "loss of" requires some kind of physical alteration is that it would make the terms "loss of" and "damage to" redundant. According to Plan Check, the Policy must be read so that these two terms have different meanings. Opp. at 14; *see also Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal.App.4th 715, 753 (1993) ("The way we define words should not produce redundancy, but instead should give each word significance.").

Plan Check's interpretation of "physical loss of" would not require a tangible alteration to the property, but would "include[] changes in what activities can physically occur in the space that cause loss to the insured, without including changes to the property that have no physical manifestation." Opp. at 14. This would be a major expansion of insurance coverage, but by limiting the requirement of a tangible alteration to "physical damage to," Plan Check argues this better harmonizes the case law while giving effect to these two terms. Under this interpretation, its inability to offer on-premise dining at its restaurants would be a physical loss of property covered by the Policy, even though there was no physical alteration.

While Plan Check's argument is not inconceivable, the Court finds that it places too much weight on the need to avoid surplusage, and asks a handful of words – "loss," "of," and "to" – to do too much work. The Court is mindful of the principle that in interpreting insurance policies, a court should "give effect to every part of the policy with each clause helping to interpret the other." *Palmer*, 21 Cal.4th at 1115. However, this is not an inflexible rule that a court must follow when the outcome would be impracticable. *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."); *Flintkote Co. v. General Acc. Assur. Co.*, 410 F.Supp.2d 875, 890 (N.D. Cal. 2006) (observing that in "adopt[in]g the only reasonable construction of the contract," "[t]he fact that some redundancy results is not fatal").

The authorities the Court has seen often blur the very distinction between "loss" and "damage" that Plan Check argues is so critical. In the insurance context, "loss" and "default" are the default, catch-all terms for referring to what the insured is protected against. *See* Black's Law Dictionary (11th ed. 2019) (defining "insurance" as "[a] contract by which one party (the insurer) unertakes to indemnify another party (the insured) against risk of loss, damage, or liability arising from the occurrence of some specified contingency"). One treatise notes that in modern all-risk property insurance policies (such as the Policy), the trigger language is often "physical loss or damage," though it also "may be any of several variants focusing on 'injury,' 'damage,' and the

like."  Couch on Insurance, § 148:46 (emphasis added).  Just three paragraphs later, the treatise goes on to observe – speaking about what is covered by these policies – that "[t]he requirement that the *loss* be 'physical' . . . is widely held to exclude alleged losses that are intangible or incorporeal."  Couch on Insurance, § 148:46 (emphasis added).  Though the language uses the word "loss," it is clear that the treatise is referring to all property insurance policies.  No matter whether the trigger language is "physical loss or damage" or simply "injury," "loss," "damage," or something else, most courts – at least according to this treatise – hold that the tangible requirement applies.  *See Simon Marketing, Inc. v. Gulf Ins. Co*., 149 Cal.App.4th 616, 623 (2007) ("the reference to 'direct' losses is intended to mean *direct losses to property*, *i.e.*, physical damage to insured property * * * * 'detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property' (10A Couch on Insurance, *supra*, § 148:46, p. 148-81) is not compensable under a contract of property insurance.").

The weight of California law also appears to require some tangible alteration, no matter whether the trigger language uses "loss" or "damage."  One California court, dealing with an identical "direct physical loss of or damage to property" trigger, was confronted with a case involving a plaintiff who lost information stored in a computer database.[4]  *See Ward Gen. Ins. Serv., Inc. v. Emp'rs Fire Ins. Co.*, 114 Cal.App.4th 548 (2003).  In determining that the loss of the database information was not a physical loss of property, the court focused on the fact that the property lost by the plaintiff could not "be said to have a material existence, be formed out of tangible matter, or be perceptible to the sense of touch."  *Id.* at 556.

Plan Check's reliance on the difference between prepositions – "of" versus "to" – is tied up with the "loss"/"damage" issue and also goes too far.  For example, in arguing for a tangible-alteration requirement, AmGuard cited to a case involving a policy that covered "accidental direct physical *loss to* business personal property."  *See* Mot. at 10 (citing *MRI Healthcare Ctr.*, 187 Cal.App.4th 766); *see also* Reply at 8.  That court observed that "some external force must have acted upon the insured property to cause a physical change in the condition of the property, *i.e.* it must have been '*damaged'* within the common understanding of that term."  *MRI Healthcare Ctr.*, 187 Cal.App.4th at 780 (emphasis added).  Plan Check argues that the requirement of a "physical change" is not tied to the use of the word "loss," but rather stems from the preposition "to," and

---

[4] The information was lost due to human error and a bug in the software, not mechanical or electrical failure in the hardware storing the database information.

therefore should not be imported into an interpretation of the Policy's "physical loss of or damage to" trigger.  But did the mere word "to" do all the work there, or did the fact that "loss" was the sole trigger also contribute?  For example, what good would a policy that protected against "direct physical *loss of* business personal property" be if it covered the misplacement of some property (without any physical alternation), but not its physical destruction?  Not much, and yet that is the interpretation that Plan Check's reasoning would support.

The Court agrees with Plan Check that sometimes the distinction between prepositions is important, but finds that this case is not one of them.  In arguing that "loss of" property should extend to instances where an owner is dispossessed of the property, Plan Check relies heavily on a case involving an insurance policy of personal – as opposed to real – property that used the identical "direct physical loss of or damage to" trigger.  *See* Opp. at 12 (citing *Total Intermodal Serv. Inc. v. Travelers Prop. Cas. Co. of Am.*, 17-cv-04908, 2018 WL 3829767 (C.D. Cal. July 11, 2018).  When the insured did not receive its cargo because the cargo was accidentally shipped to the wrong port (custom authorities there refused to return it), the insurer argued that the loss was not covered because there was no physical damage to the cargo.[5]  The court rejected this argument, finding that "'[physical] loss of' property contemplates that the property is misplaced and unrecoverable, without regard to whether it was damaged."  *Total Intermodal*, 2018 WL 3829767 at *3.  While the court drew a distinction between "loss of" and "loss to," it was careful to "recognize[] that the same phrase in a different kind of insurance contract could mean something else."  *Id.*, n. 4.  The Court agrees that it would be a strange cargo insurance policy that covered only physical damage to the cargo, but not the insured's deprivation of it.  In that setting, the court's holding that "the phrase '[physical] loss of' includes the permanent dispossession of something" makes sense.  *Id.*  However, it requires a leap to extend that understanding of a permanent dispossession to the real-property insurance context to "include[] changes in what activities can physically occur in the space that cause loss to the insured."  Opp. at 15.

Ultimately, the Court finds that Plan Check's interpretation is not a reasonable one because it would be a sweeping expansion of insurance coverage without any manageable bounds.  Plan Check insists that its bounding of "physical loss" to situations where changes in permitted physical activities is workable, but as AmGuard notes, it would mean that potentially any regulation that

---

[5] The cargo was in fact later destroyed, but the destruction did not happen during the applicable time period. *Total Intermodal*, 2018 WL 3829767 at *3.

7

limits a business's operations would trigger coverage. Reply at 7. For example, consider the following scenarios: (1) a city changes its maximum occupancy codes to lower the caps, meaning that a particular restaurant can no longer seat as many customers as it used to;[6] (2) a city amends an ordinance requiring restaurants located in residential zones to cease operations between 1:00 a.m. and 5:30 a.m. to expand the window to 12:00 a.m. to 6:00 a.m.; (3) a city issues a mandatory evacuation order to all of its residents due to nearby wildfires (a consequence of this is that all businesses must suspend operations), but lifts the order three weeks later when the wildfires are extinguished without, fortunately, any destruction of property. Under Plan Check's standard, all of these instances would trigger insurance coverage. While Plan Check may believe that that is an appropriate result, the Court is not persuaded.[7]

The manageability issue is not limited to government action, but with anything that interferes with the permitted physical activities on a property. If a building's elevator system had a software bug that temporarily shut down all the elevators, that would clearly interfere with permitted physical activities. Similarly, a snowstorm would interfere with a restaurant's outdoor dining service. And yet Plan Check's interpretation would cover all of these scenarios. It offers no way, and the Court does not see any way, to limit this coverage. Though parties could in theory contract away coverage, this is not practicable for all-risk policies where everything is covered unless expressly excluded. The list of losses that do not fit within the parties' expectations of what property insurance should cover would be a very, very long one.

## IV. Conclusion

Small businesses are suffering from this unprecedented pandemic and COVID-19 insurance cases are starting to be litigated across the nation. However, Plan Check's theory of relief is a major departure from established California law. Just last month, another court in this district dismissed a suit brought by another Los Angeles restaurateur against its insurer involving the identical "physical loss of or damage to" trigger. *See 10E, LLC v. Travelers Indemnity Co. of Connecticut et al.*, 20-cv-04418 (C.D. Cal. Aug. 28, 2020).[8] Based on the foregoing reasons, the

---

[6] To be concrete, suppose that the restaurant can no longer seat six people to a booth, but is now limited to four people to a booth. The changed maximum occupancy codes therefore do not render any booth or other structure in the restaurant useless.

[7] Because the Court finds that Plan Check has not suffered any physical loss of or damage to its properties and therefore its loss is not covered by the Policy, it does not address AmGuard's additional argument that the Policy's virus exclusion applies.

[8] Faced with similar insurance policies and claims – though dealing with different bodies of state law – courts

Court finds that Plan Check's claims were not covered by the Policy and therefore Plan Check fails to state a claim for a breach of contract or the covenant of good faith and fair dealing. Its derivative claim for unfair business practices therefore also fails. Accordingly, the Court **GRANTS** the motion.

---

have split on whether the insureds' losses during the COVID-19 pandemic are covered. Some have applied a similar "physical alteration" standard as this Court. *See, e.g.*, *Social Life Magazine, Inc. v. Sentinel Ins. Co. Ltd.*, No. 20-cv-03311 (S.D.N.Y. May 14, 2020) (applying New York law); *see also Mama Jo's, Ins. v. Sparta Ins. Co.*, No. 17-cv-23362, 2018 WL 3412974, at * (S.D. Fla. Jun. 11, 2018) (finding that insured had not demonstrated "physical loss of or damage to" its restaurant due to nearby construction dust and debris accumulating on it because the loss was "intangible or incorporeal"). At least one court has ruled in favor of plaintiffs by denying a motion to dismiss. *See Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-cv-03127, 2020 WL 4692385, at *5 (W.D. Mo. Aug. 12, 2020) (applying Missouri law and observing that although "there is case law in support of its position that physical tangible alteration is required to show a 'physical loss,'" deciding that that case law was either factually dissimilar or not binding and therefore declining to apply a physical-alteration requirement on the motion to dismiss).

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3    HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

4

5    PLAN CHECK DOWNTOWN III, LLC,

6                    Plaintiff,

7        vs.                                Case No. CV 20-6954-GW

8    AMGUARD INSURANCE COMPANY,
     et al,

9

10                   Defendants.
     _____/

11

12

13                   REPORTER'S TRANSCRIPT OF
                     TELEPHONIC HEARING MOTION TO DISMISS
                     THURSDAY, SEPTEMBER 10, 2020
14                              8:30 A.M.
                     LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22    _____

                TERRI A. HOURIGAN, CSR NO. 3838, CCRR
23               FEDERAL OFFICIAL COURT REPORTER
                 350 WEST FIRST STREET, ROOM 4311
24               LOS ANGELES, CALIFORNIA  90012
                           (213) 894-2849
25

```
 1                    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4        HECHT PARTNERS LLP
          BY:  KATHRYN LEE BOYD
 5             JANINE FELICIA COHEN
          Attorneys at Law
 6        125 Park Avenue, 25th Floor
          New York, New York  10017
 7        lboyd@hechtpartners.com

 8

 9    FOR THE DEFENDANT:

10        SIMPSON THACHER and BARTLETT LLP
          BY:  CHET A. KRONENBERG
11        Attorney at Law
          1999 Avenue of the Starts, 29th Floor
12        Los Angeles, California  90067
          ckronenberg@stblaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      **LOS ANGELES, CALIFORNIA; THURSDAY, SEPTEMBER 10, 2020**

2      **8:30 A.M.**

3      --oOo--

4

5

6      THE COURT:  Let me call the matter of *Plan Check*

7 *versus AmGuard Insurance*.

8    For the plaintiff, we have?

9      MS. BOYD:  This is Kathryn Lee Boyd for Plan Check

10 the plaintiff.  I just want to make sure you can hear me?

11      THE COURT:  Yes, I can.  And for the defendant?

12      MR. KRONENBERG:  Chet Kronenberg for the defendant.

13      THE COURT:  We are here on the motion to dismiss.  I

14 issued a tentative on this.  I presume both sides have seen it?

15      MR. KRONENBERG:  Yes.

16      MS. BOYD:  Yes.

17      THE COURT:  Does somebody want to argue something?

18      MS. BOYD:  Yes, Your Honor.  This is Kathryn Boyd

19 for the plaintiff.  I would like to be heard on a few points --

20      THE COURT:  Sure.

21      MS. BOYD:  -- regarding the tentative.  We would ask

22 the Court to consider and perhaps reconsider its decision

23 before adopting it in full?

24      THE COURT:  Okay.

25      MS. BOYD:  Okay.  First point, Your Honor, is to

1   address what appears to be the Court's concern that Plan

2   Check's interpretation of physical loss as a separate meaning

3   in the contract of dispossession of the property would

4   improperly expand this all-risk policy beyond what was

5   anticipated or could be anticipated by the carrier and beyond

6   the precedent.

7       There is really two points I want to make.

8       First is, specifically in this case, AmGuard could have

9   anticipated our very scenario in light of previous cases that

10  were cited in the tentative even.

11      By including definitions of physical loss as tangible

12  alteration, which has been in the case law, and including also

13  definitions of physical and/or loss that would have clarified

14  it has to be a tangible alteration or a permanent loss.  It did

15  not, which is why we, the plaintiff, has put forward what a

16  reasonable insured standard would think physical loss meant,

17  especially in light of the fact that it's used with -- in

18  conjunction with damage, so that it has, of course, under the

19  cannon of interpretation, which Your Honor said was not

20  inconceivable, would be given a separate meaning all together.

21      Further, in the tentative, Your Honor sets forth a series

22  of hypotheticals which the Court felt would, under our Plan

23  Check's interpretation of the contract, be something that could

24  not have been anticipated.  But in fact in this case they were

25  anticipated by the carrier and the policy provides for them.

1    Let me be specific.

2         Scenarios 1 and 2 hypotheticals in the tentative, and I'm

3    referring to page 8, regarding open-ended sort of government

4    edicts to change occupancy or hours for restaurants are already

5    excluded by the law or ordinance exclusion in the policy, so

6    they were anticipated.

7         Same with the snowstorm scenario.  They were anticipated.

8    Snow is one of the limitations in the policy, at A-4, A-5.

9         Also, the Court's scenario in the tentative regarding

10   mandatory evacuation orders.  The policy also safeguards for

11   these types of situations because they require the physical

12   loss to be direct.

13        These evacuation orders would not be direct physical loss

14   of the property, but indirect.

15        Further, the Court's Footnote 6 in the tentative

16   discussing the government limitations of people per table, we,

17   the plaintiffs, would agree this wouldn't be a loss of

18   anything.  They haven't lost any use of the dining premises.

19        It hasn't been a dispossession.

20        So given that the concern here is that this all-risk

21   policy would be with the definition we put forward, the one

22   that was adopted in the *Total Intermodal* case would allow sort

23   of a parade of horribles of unanticipated situations that the

24   carrier would be responsible for, we would submit is not

25   troubling after all.

1      That is the first point.

2      The second point is really the Court's tentative sort of

3  what we perceive is -- there is a couple of pages of discussion

4  that loss, the word "loss" as used here in direct physical loss

5  or damage to is likened to a triggering word, whether the claim

6  is compensable.

7      We agree loss can be -- that word could be a triggering

8  word, but here, we don't have that situation because this is

9  maybe why we count on the "to" and "of" so much.

10      "Loss to" does sound like a triggering -- sort of a

11  triggering clause in an insurance sense.

12      "Loss of" sounds to a reasonable insured an ordinary and

13  popular sense of the word, like I have lost my watch, loss of

14  property.

15      Here, the loss of the use of the dining facility, in the

16  same way it could be loss if first responders in a fire take

17  over the dining hall.

18      So we disagree with analytically likening in this contract

19  the reading of the word as a loss -- physical loss as a

20  triggering.  And, of course, as we have briefed and Your Honor

21  has considered, it does, of course, create a surplus word and

22  contravenes the cannon of interpretation that each word be

23  given its every-day effect.

24      We just wanted to say a word on the *10E* case, that also

25  has come up to this district in the same -- you know, in the

```
 1   same way that our case has.  And, quite frankly, I think Your
 2   Honor acknowledges in the tentative these issues are being teed
 3   up around the country right now given what has happened with
 4   the pandemic.
 5        So but we -- I do want to address the 10E case because it
 6   was -- we filed a response to the notice of supplemental
 7   authority on that.  It's not, of course, an active case, but
 8   it's cited in the tentative.
 9        We do believe that that was wrongly decided.  It's based
10   really on the permanent loss that was talked about in Total
11   Intermodal, but it was a necessary decision, but it was more of
12   a dicta, and permanent loss is not required for there to be a
13   loss in the sense of this policy in particular because the
14   policy anticipates there will be a payment of business
15   interruption insurance for a period of restoration, which means
16   that the loss or the damage would be a temporary, not a
17   permanent loss, at all.
18        So it goes against the nature of this particular coverage
19   and this particular contract.
20        My third point, very brief, is that not addressing the
21   tentative was the civil authority coverage.  It can still apply
22   here without the business income coverage, and we just wanted
23   to make that point.
24        One very final point, which was not discussed in the
25   tentative, of course, is the Efficient Proximate Cause Doctrine
```

1   which we fully briefed, and I think the other side did too, and

2   we would argue that this is not a case where the virus and the

3   orders that came down from the state and city were inexplicably

4   intertwined or conceptionally the same.

5        They were very different, and the government, as in some

6   states, had the option regardless of the pandemic to not shut

7   down their restaurants.

8        So with those points made, Your Honor, I appreciate the

9   opportunity to be heard.

10           THE COURT:  All right.  Let me hear from the

11  defense.  What's your responses to the points?

12       Although, the last one was the virus exclusion, I

13  indicated I wasn't going to address that, because I didn't need

14  to at this point in time, so I won't address that.

15       Let me ask defense counsel, what is your response to the

16  other arguments raised by plaintiff's counsel?

17           MR. KRONENBERG:  Sure.  Chet Kronenberg, and I

18  represent the defendant, AmGuard Insurance Company.

19       With respect to plaintiff's first point that there is no

20  definition in the policy for physical loss, I mean, the case

21  law discusses that phrase in depth, and the Court set out in

22  its tentative ruling under the case law and treatises to

23  establish direct physical loss of damage to property, there

24  must be some tangible alteration to the property.

25       Here, plaintiff doesn't allege its premises were

1   contaminated with Covid-19; therefore, there is no conceivable

2   direct physical loss of damage to plaintiff's premises.

3         You know, property insureds are not responsible any time

4   some factor external to the policyholder's premises limits the

5   policyholder's operations in a way that reduces profitability.

6         I want to discuss for a minute on this point, a decision

7   that the Court cited in Footnote 8, which was the *Studio 417*

8   case, which the Court held -- you know, that a Federal Court in

9   Missouri applied Missouri law, declined to apply physical

10  alteration requirement on a motion to dismiss in a case where

11  the policyholder sought insurance coverage stemming from

12  Covid-19.

13        I want to address that case.  It is completely

14  distinguishable from the fact pattern here, and I think it

15  shows specifically why the Court's tentative ruling is right.

16        In that case, unlike in this case, there was no virus

17  exclusion.

18        The policyholder in that case alleged that the plaintiff's

19  premises were infected with Covid-19, and it suffered direct

20  physical loss of property.

21        In other words, the policyholder in that case alleged that

22  its loss of income was attributed to contamination of property.

23        Here, because of the virus exclusion, plaintiff did not a

24  allege that its loss of income was attributed to the virus.

25  Instead, plaintiffs are relying on loss of use of its premises.

1   Plaintiff's loss is not direct physical loss with regard to

2   damage of property.  It just isn't, under the case law.

3        With respect to, you know, plaintiff's second argument

4   about, you know, the definition of loss in the *10E* case, I can

5   just say that Judge Wilson's decision in the *10E* case is

6   directly on point.

7        He found that a restaurant, just like a restaurant here,

8   did not plausibly allege that it suffered direct physical loss

9   or damage to the property as a result of social distancing

10  orders stemming from Covid 19.

11       Judge Wilson rejected the very argument plaintiff is

12  making now with regard to the word "of" and the word "loss."

13       Judge Wilson discussed *Total Intermodal*, upon which

14  plaintiff relied and held that it was in apposite.

15       Judge Wilson held that even if the policies covers

16  permanent disposition of property, in addition to physical

17  alteration of property, the restaurant didn't allege that it

18  was permanent dispossessed any property.

19       Judge Wilson held that the restaurant remained in

20  possession of all of its dining room, bar, flatware, and all

21  the accoutrements at all times, just like the plaintiff here.

22       Moreover, based on the social distancing orders that

23  plaintiff relies upon, plaintiff could still use its restaurant

24  for takeout and delivery.

25       I also want to give the Court some comfort that the *10E*

1   case isn't the only one that shared the same views as this

2   Court in its tentative ruling.

3        Another California Court recently came to the same

4   conclusion, as Judge Wilson, and this Court's tentative.

5        In *Inns By the Sea versus California Mutual Insurance*

6   *Company,* which is a case out of the Monterrey, California

7   Superior Court, Case No. 20-CV-001274, a August 6, 2020

8   decision, the California Superior Court sustained a demurrer

9   for lost business income based on the failure to satisfy the

10   direct physical loss of damage to property requirement where

11   the policyholder suspended its business operations as a result

12   of social distancing orders related to Covid-19.

13        If the Court would like me to forward this decision, I'm

14   happy to.

15        In addition, we cited in our papers, you know, two other

16   cases with exact same policy language where Courts found -- you

17   know, rejected the argument that there was physical loss of

18   damage to plaintiff's property.  That is the *Malaube* case out

19   of Florida, where social distancing orders allegedly limited

20   access to a restaurant and the *Gavrilides* case, which also

21   involved two restaurants, and that case was out of Michigan.

22        In plaintiff's response to our notice of supplemental

23   authority, the plaintiffs said the policy language in the

24   Florida case was different, but it's not.

25        If you look at page 8 of that decision, it was also direct

1  physical loss over damage of property.

2      With respect to plaintiff's third point about, you know,

3  whether the virus exclusion applies, and the application of the

4  Efficient Proximate Cause Doctrine, whether that applies or

5  not, I'm happy to address that if the Court wants, but if the

6  Court says there is no need to get to that, I don't want to

7  waste of the Court's time.

8          THE COURT:  I don't think you have to at this point.

9      Let me ask this question, well, two questions:  First of

10  all, at one point in time I thought there was some discussion

11  of doing MDLs for these types of cases, but it's my

12  understanding that the panel said no, but it might entertain

13  MDLs as to individual insurers.

14      Is counsel aware of any of that type of discussion?

15          MR. KRONENBERG:  It is Chet Kronenberg for the

16  defendants.

17      I know that some MDL applications were denied.  I don't

18  know the specifics.  I wasn't involved in that briefing.  I

19  just don't want to -- you know, I know generally the topic, but

20  I don't know the details, so I don't want to speak to it.

21          THE COURT:  All right.  Let me ask plaintiff's

22  counsel, have you heard anything about that subject?

23          MS. BOYD:  No, Your Honor, I have not.

24          THE COURT:  Then the other question is, is that I

25  probably will go with my tentative and grant the dismissal.

1          The question is, do I dismiss with or without prejudice?

2               MR. KRONENBERG:  Chet Kronenberg for the defendant.

3          We think it should be with prejudice.

4          And, you know, the reason is I don't see how plaintiffs

5     can possibly amend in a way that is not futile, because

6     plaintiff's theory now is based on loss of use of its premises,

7     and the Court's view there is that with loss of use, well,

8     plaintiff didn't allege direct physical loss of her damage to

9     property.

10         If plaintiff is going to try to change its theory to

11    allege some sort of contamination, then indisputably the virus

12    exclusion applies, so AmGuard's view is the dismissal should be

13    with prejudice.

14              THE COURT:  Let me hear from the plaintiff.

15              MS. BOYD:  This is Kathryn Lee Boyd for plaintiff.

16         Your Honor, we have been thinking about this.

17         We would ask -- well, two things:  No. 1, there were two

18    new cases today that were argued by counsel that we would like

19    an opportunity to at least read and respond to if Your Honor is

20    so inclined.

21         As far as -- we would ask that it be without prejudice

22    now.

23              THE COURT:  Okay.

24              MS. BOYD:  Again, we do believe these cases are

25    going to be percolating up to the Appeals Court.

1          THE COURT:  But that is the thing.  I was thinking

2     that maybe you wanted to be the first to percolate up there.

3     Give you some Appellate Court argument time.

4          MS. BOYD:  Yes.  I just was, you know, of course,

5     I'm texting with my team on this.  We were thinking about this,

6     we may.

7        Your Honor, what I'm asking for is time.  If would you

8     allow us to respond to the Court --

9          THE COURT:  Actually, I tell you what I will do, I

10    will withhold issuing a final ruling.

11       I will issue a final ruling, and, you know, you guys can

12    let me know what your views are on that.  So if you can decide

13    it in a week or ten days, I will put this matter over for a

14    week or ten days; is that all right?

15         MS. BOYD:  That would be perfect.  I really

16    appreciate that.

17         THE COURT:  What I will do, I will put the matter

18    back on calendar -- do you want a week or two days?

19         MS. BOYD:  Next Thursday is fine.

20         THE COURT:  Okay, so the 17th?

21         MS. BOYD:  Sure.

22         THE COURT:  I will put it back for the 17th, and we

23    will discuss --

24         MR. KRONENBERG:  Your Honor, what are we waiting

25    for?

```
 1              THE COURT:  She's going to let me know whether or

 2   not she would have no problem with my issuing the dismissal

 3   with prejudice, in which case then the matter would be ripe for

 4   appeal, or whether or not she's going to think about it and

 5   decide that she may want to try to amend the complaint to see

 6   if she can get around the problems that I have raised in the

 7   tentative.

 8              MR. KRONENBERG:  Okay.

 9              THE COURT:  So the 17th at 8:30.  Everybody stay

10   safe.

11              MR. KRONENBERG:  Thank you.

12              MS. BOYD:  Thank you, Your Honor.

13               (The proceedings concluded at 10:21 a.m.)

14                              *  *  *

15

16

17

18

19

20

21

22

23

24

25
```

16

1    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                              )
4    STATE OF CALIFORNIA     )

5

6          I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  9/14/2020

17

18

19                        /s/ TERRI A. HOURIGAN
                   _____
20                 TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                         Federal Official Court Reporter
21

22

23

24

25

Case 3:20-cv-06772-FLW-TJB   Document 23   Filed 09/18/20   Page 34 of 49 PageID: 723

1

## /

**/s** [1] - 16:19

## 0

**001274** [1] - 11:4

## 1

**1** [1] - 13:12
**10:21** [1] - 15:6
**14th** [1] - 1:13
**17th** [3] - 14:14, 14:16, 15:2
**19** [1] - 10:7

## 2

**20** [1] - 11:4
**2020** [1] - 11:4
**2020day/date/year** [1] - 1:13
**213** [3] - 1:24, 2:6, 2:11
**28** [1] - 16:9

## 3

**350** [1] - 1:23
**3838** [2] - 1:22, 16:20

## 4

**417-case** [1] - 9:6
**4311** [1] - 1:23

## 6

**6** [2] - 5:16, 11:4

## 7

**753** [1] - 16:9

## 8

**8** [3] - 5:4, 9:5, 11:22
**894-2305** [1] - 2:6
**894-2849** [1] - 1:24
**8:30** [1] - 15:2

## 9

**9/14/2020** [1] - 16:16
**90012** [1] - 1:23

## A

**A-4** [1] - 5:9
**A-5** [1] - 5:9

**a.m** [1] - 15:6
**above-entitled** [1] - 16:12
**access** [1] - 11:16
**acknowledges** [1] - 7:1
**active** [1] - 7:6
**acutrements** [1] - 10:18
**addition** [2] - 10:13, 11:12
**address** [6] - 4:1, 7:4, 8:10, 8:11, 9:11, 12:2
**ADDRESS** [3] - 2:5, 2:10, 2:15
**addressing** [1] - 7:18
**adopted** [1] - 5:23
**adopting** [1] - 3:23
**agree** [2] - 5:18, 6:8
**all-risk** [2] - 4:4, 5:21
**allege** [6] - 8:22, 9:22, 10:5, 10:14, 13:3, 13:6
**alleged** [2] - 9:16, 9:19
**allegedly** [1] - 11:16
**allow** [2] - 5:23, 14:2
**alteration** [5] - 4:12, 4:14, 8:21, 9:8, 10:14
**amend** [2] - 12:25, 14:23
**AmGuard** [3] - 3:7, 4:8, 8:15
**AmGuard's** [1] - 13:7
**analytically** [1] - 6:17
**ANGELES** [4] - 1:14, 1:23, 3:1, 16:3
**anticipated** [7] - 4:5, 4:9, 4:25, 5:1, 5:7, 5:8
**anticipates** [1] - 7:13
**appeal** [1] - 14:22
**Appeals** [1] - 13:20
**APPEARANCES** [1] - 2:1
**Appellate** [1] - 13:23
**application** [1] - 11:25
**applications** [1] - 12:13
**applied** [1] - 9:7
**applies** [3] - 11:25, 12:1, 13:7
**apply** [2] - 7:19, 9:7
**apposite** [1] - 10:11
**appreciate** [2] - 8:5, 14:10
**argue** [2] - 3:17, 7:25
**argued** [1] - 13:13
**argument** [4] - 10:1,

10:8, 11:14, 13:23
**arguments** [1] - 8:13
**Attorney** [2] - 2:5, 2:10, 2:15
**attributed** [2] - 9:20, 9:22
**ATTY** [12] - 2:4, 2:5, 2:6, 2:9, 2:10, 2:11, 2:14, 2:15, 2:16
**August** [1] - 11:4
**authority** [3] - 7:6, 7:19, 11:20
**aware** [1] - 12:11

## B

**bar** [1] - 10:17
**based** [4] - 7:8, 10:19, 11:6, 13:1
**beyond** [2] - 4:4, 4:5
**BOYD** [13] - 3:9, 3:16, 3:18, 3:21, 3:25, 12:19, 13:10, 13:19, 13:24, 14:9, 14:13, 14:15, 15:5
**Boyd** [3] - 3:9, 3:18, 3:10
**brief** [1] - 7:18
**briefed** [2] - 6:19, 7:24
**briefing** [1] - 12:14
**business** [4] - 7:13, 7:20, 11:6, 11:8
**BY** [3] - 2:4, 2:9, 2:14

## C

**calendar** [1] - 14:12
**CALIFORNIA** [5] - 1:2, 1:14, 1:23, 3:1, 16:4
**California** [8] - 2:6, 2:11, 2:16, 10:25, 11:2, 11:3, 11:5, 16:8
**cannon** [2] - 4:19, 6:21
**carrier** [3] - 4:5, 5:1, 5:25
**Case** [1] - 1:7
**case** [28] - 4:8, 4:12, 4:25, 5:23, 6:23, 6:25, 7:4, 7:6, 7:25, 8:17, 8:19, 9:8, 9:11, 9:14, 9:16, 9:19, 9:25, 10:2, 10:3, 10:23, 11:3, 11:4, 11:15, 11:17, 11:18, 11:21, 14:21
**cases** [5] - 4:9, 11:13, 12:8, 13:13, 13:19

**CCRR** [1] - 1:22
**Central** [1] - 16:8
**CENTRAL** [1] - 1:2
**CERTIFICATE** [1] - 16:1
**certify** [1] - 16:8
**change** [2] - 5:5, 13:5
**Check** [2] - 3:6, 3:9
**Check's** [1] - 4:2
**Checks** [1] - 4:24
**Chet** [4] - 3:12, 8:14, 12:12, 12:23
**cited** [4] - 4:10, 7:7, 9:5, 11:12
**city** [1] - 8:1
**CITY** [3] - 2:6, 2:11, 2:16
**civil** [1] - 7:19
**claim** [1] - 6:6
**clarified** [1] - 4:13
**clause** [1] - 6:11
**Code** [1] - 16:9
**comfort** [1] - 10:22
**comp** [1] - 11:3
**Company** [1] - 8:15
**compensable** [1] - 6:7
**complaint** [1] - 14:23
**completely** [1] - 9:11
**conceivable** [1] - 8:23
**conceptionally** [1] - 8:2
**concern** [2] - 4:1, 5:21
**concluded** [1] - 15:6
**conclusion** [1] - 11:1
**conference** [1] - 16:13
**conformance** [1] - 16:13
**conjunction** [1] - 4:18
**consider** [1] - 3:22
**considered** [1] - 6:20
**contaminated** [1] - 8:22
**contamination** [2] - 9:20, 13:6
**contract** [4] - 4:3, 4:24, 6:18, 7:17
**contravenes** [1] - 6:21
**correct** [1] - 16:10
**COUNSEL** [1] - 2:1
**counsel** [5] - 8:12, 8:13, 12:11, 12:18, 13:13

**count** [1] - 6:10
**country** [1] - 7:2
**COUNTY** [1] - 16:3
**couple** [1] - 6:4
**course** [6] - 4:18, 6:19, 6:20, 7:6, 7:23, 13:24
**Court** [20] - 3:22, 4:23, 8:18, 9:5, 9:6, 10:22, 10:24, 10:25, 11:4, 11:5, 11:10, 12:2, 12:3, 13:20, 13:23, 14:2, 16:7, 16:20
**COURT** [21] - 1:1, 1:22, 3:6, 3:11, 3:13, 3:17, 3:20, 3:24, 8:7, 12:5, 12:17, 12:20, 13:9, 13:18, 13:21, 14:3, 14:11, 14:14, 14:16, 14:19, 15:2
**Court's** [8] - 4:1, 5:10, 5:16, 6:3, 9:13, 11:1, 12:4, 13:2
**Courts** [1] - 11:13
**coverage** [4] - 7:17, 7:19, 7:20, 9:9
**covers** [1] - 10:12
**Covid** [1] - 10:7
**Covid-19** [4] - 8:22, 9:10, 9:17, 11:9
**create** [1] - 6:20
**CRR** [1] - 16:20
**CSR** [1] - 1:22, 16:20
**CV** [1] - 11:4

## D

**damage** [11] - 4:18, 6:6, 7:15, 8:20, 8:24, 9:25, 10:6, 11:7, 11:14, 11:23, 13:4
**Date** [1] - 16:16
**day/date/year** [1] - 3:1
**days** [3] - 14:7, 14:8, 14:12
**decide** [2] - 14:7, 14:23
**decided** [1] - 7:8
**decision** [7] - 3:22, 7:10, 9:4, 10:3, 11:4, 11:10, 11:22
**declined** [1] - 9:7
**DEFENDANT** [2] - 2:8, 2:13
**defendant** [4] - 3:11, 3:12, 8:15, 12:23
**defendants** [1] - 12:12

**Defendants** [1] - 1:9
**defense** [2] - 8:8, 8:12
**deficient** [1] - 12:1
**definition** [3] - 5:22, 8:17, 10:2
**definitions** [2] - 4:11, 4:13
**DEFT** [9] - 1:8, 2:9, 2:10, 2:11, 2:14, 2:15, 2:16
**delivery** [1] - 10:21
**demurrer** [1] - 11:5
**denied** [1] - 12:13
**details** [1] - 12:16
**dicta** [1] - 7:11
**different** [2] - 8:3, 11:21
**dining** [4] - 5:19, 6:14, 6:16, 10:17
**direct** [11] - 5:13, 5:14, 6:5, 8:20, 8:23, 9:17, 9:24, 10:5, 11:6, 11:22, 13:3
**directly** [1] - 10:3
**disagree** [1] - 6:17
**discuss** [2] - 9:4, 14:17
**discussed** [2] - 7:22, 10:10
**discusses** [1] - 8:18
**discussing** [1] - 5:16
**discussion** [3] - 6:4, 12:7, 12:11
**dismiss** [3] - 3:13, 9:8, 12:22
**dismissal** [3] - 12:21, 13:7, 14:20
**disposition** [1] - 10:13
**dispossessed** [1] - 10:15
**dispossession** [2] - 4:3, 5:20
**distancing** [4] - 10:6, 10:19, 11:9, 11:16
**distinguishable** [1] - 9:12
**District** [2] - 16:7, 16:8
**DISTRICT** [3] - 1:1, 1:2, 1:3
**district** [1] - 6:24
**DIVISION** [1] - 1:2
**doctrine** [2] - 7:23, 12:1
**down** [2] - 8:1, 8:4

**E**

**edicts** [1] - 5:5
**eed** [1] - 7:2
**effect** [1] - 6:22
**efficient** [1] - 7:23
**ended** [1] - 5:4
**Ends** [1] - 11:2
**entertain** [1] - 12:9
**entitled** [1] - 16:12
**especially** [1] - 4:17
**establish** [1] - 8:19
**evacuation** [2] - 5:11, 5:14
**every-day** [1] - 6:22
**exact** [1] - 11:13
**excluded** [1] - 5:6
**exclusion** [6] - 5:6, 8:9, 9:15, 9:21, 11:25, 13:7
**expand** [1] - 4:4
**external** [1] - 9:1

**F**

**facility** [1] - 6:14
**fact** [3] - 4:17, 4:25, 9:12
**factor** [1] - 9:1
**failure** [1] - 11:6
**far** [1] - 13:16
**Federal** [3] - 9:6, 16:6, 16:20
**FEDERAL** [1] - 1:22
**felt** [1] - 4:23
**few** [1] - 3:19
**filed** [1] - 7:5
**final** [3] - 7:22, 14:4, 14:5
**fine** [1] - 14:13
**fire** [1] - 6:15
**FIRM** [3] - 2:4, 2:9, 2:14
**first** [7] - 3:25, 4:8, 6:2, 6:15, 8:16, 12:6, 13:22
**FIRST** [1] - 1:23
**flat** [1] - 10:17
**Florida** [2] - 11:16, 11:21
**Footnote** [2] - 5:16, 9:5
**FOR** [2] - 2:3, 2:8, 2:13
**foregoing** [1] - 16:10
**format** [1] - 16:12
**forth** [1] - 4:22
**forward** [3] - 4:15, 5:22, 11:10

**frankly** [1] - 6:25
**full** [1] - 3:23
**fully** [1] - 7:24
**futile** [1] - 13:1

**G**

**Gabruitis** [1] - 11:17
**generally** [1] - 12:15
**GEORGE** [1] - 1:3
**given** [4] - 4:20, 5:21, 6:22, 7:2
**government** [3] - 5:4, 5:17, 8:3
**grant** [1] - 12:21
**guys** [1] - 14:6

**H**

**hall** [1] - 6:16
**happy** [2] - 11:11, 12:2
**hear** [3] - 3:10, 8:7, 13:9
**heard** [3] - 3:19, 8:6, 12:18
**held** [5] - 9:6, 10:11, 10:12, 10:16, 16:11
**hereby** [1] - 16:8
**Honor** [12] - 3:18, 3:25, 4:19, 4:22, 6:19, 7:1, 8:5, 12:19, 13:11, 13:14, 14:1, 15:5
**HONORABLE** [1] - 1:3
**horribles** [1] - 5:24
**HOURIGAN** [4] - 1:22, 16:6, 16:19, 16:20
**hours** [1] - 5:5
**hypotheticals** [2] - 4:23, 5:3

**I**

**improperly** [1] - 4:4
**inclined** [1] - 13:15
**including** [2] - 4:11, 4:12
**income** [4] - 7:20, 9:20, 9:22, 11:6
**inconceivable** [1] - 4:20
**indicated** [1] - 8:9
**indirect** [1] - 5:15
**indisputably** [1] - 13:6
**individual** [1] - 12:9
**inexplicably** [1] - 8:1
**infected** [1] - 9:17

**instead** [1] - 9:23
**insurance** [3] - 6:11, 7:14, 9:9
**Insurance** [3] - 3:7, 8:15, 11:2
**insured** [2] - 4:16, 6:12
**insureds** [1] - 8:25
**insurers** [1] - 12:10
**Intermoto** [1] - 7:10
**Intermotot** [1] - 5:23
**interpretation** [4] - 4:2, 4:19, 4:24, 6:21
**interruption** [1] - 7:13
**intertwined** [1] - 8:2
**involved** [2] - 11:17, 12:14
**issued** [1] - 3:14
**issues** [1] - 7:1
**issuing** [3] - 14:4, 14:5, 14:20

**J**

**Judge** [2] - 10:3, 11:1
**judge** [4] - 10:8, 10:10, 10:12, 10:16
**JUDGE** [1] - 1:3
**judicial** [1] - 16:13

**K**

**Kathryn** [3] - 3:9, 3:18, 13:10
**KRONENBERG** [8] - 3:12, 3:15, 8:14, 12:12, 12:23, 14:18, 15:1, 15:4
**Kronenberg** [4] - 3:12, 8:14, 12:12, 12:23

**L**

**language** [2] - 11:13, 11:20
**last** [1] - 8:8
**law** [6] - 4:12, 5:6, 8:18, 8:19, 9:7, 9:25
**Law** [3] - 2:5, 2:10, 2:15
**least** [1] - 13:14
**Lee** [2] - 3:9, 13:10
**light** [2] - 4:9, 4:17
**likened** [1] - 6:6
**likening** [1] - 6:17
**limitations** [2] - 5:9, 5:17

**limited** [1] - 11:16
**limits** [1] - 9:1
**look** [1] - 11:21
**LOS** [4] - 1:14, 1:23, 3:1, 16:3
**loss** [42] - 4:2, 4:11, 4:13, 4:14, 4:16, 5:13, 5:14, 5:18, 6:5, 6:8, 6:10, 6:12, 6:13, 6:14, 6:18, 7:9, 7:11, 7:15, 8:17, 8:20, 8:23, 9:18, 9:20, 9:22, 9:23, 9:24, 10:2, 10:6, 10:9, 11:5, 11:7, 11:14, 11:22, 13:1, 13:3
**lost** [3] - 5:19, 6:13, 6:15

**M**

**mandatory** [1] - 5:11
**matter** [5] - 3:6, 14:7, 14:11, 14:21, 16:12
**MDL** [1] - 12:13
**MDLs** [2] - 12:8, 12:9
**mean** [1] - 8:17
**meaning** [2] - 4:2, 4:20
**means** [1] - 7:14
**meant** [1] - 4:16
**Michigan** [1] - 11:18
**might** [1] - 12:9
**minute** [1] - 9:4
**Missouri** [2] - 9:7
**Monterrey** [1] - 11:3
**moreover** [1] - 10:19
**motion** [2] - 3:13, 9:8
**Moto** [1] - 10:10
**MR** [8] - 3:12, 3:15, 8:14, 12:12, 12:23, 14:18, 15:1, 15:4
**MS** [13] - 3:9, 3:16, 3:18, 3:21, 3:25, 12:19, 13:10, 13:19, 13:24, 14:9, 14:13, 14:15, 15:5
**must** [1] - 8:20
**Mutual** [1] - 11:2
**Myrube** [1] - 11:15

**N**

**nature** [1] - 7:16
**necessary** [1] - 7:10
**need** [2] - 8:10, 12:3
**new** [1] - 13:13
**Next** [1] - 14:13
**NO** [2] - 1:22, 16:20
**notice** [2] - 7:5, 11:19

number [1] - 11:4

**O**

occupancy [1] - 5:5
OF [6] - 1:2, 1:12, 2:1, 16:1, 16:3, 16:4
Official [2] - 16:6, 16:20
OFFICIAL [2] - 1:22, 16:1
one [7] - 5:3, 5:9, 5:22, 7:22, 8:9, 10:23, 12:7
oOo [1] - 3:3
open [1] - 5:4
open-ended [1] - 5:4
operations [2] - 9:2, 11:8
opportunity [2] - 8:6, 13:14
option [1] - 8:3
order [1] - 10:19
orders [6] - 5:11, 5:14, 8:1, 10:7, 11:9, 11:16
ordinance [1] - 5:6
ordinary [1] - 6:12

**P**

page [3] - 5:4, 11:21, 16:12
pages [1] - 6:4
pandemic [2] - 7:3, 8:4
panel [1] - 12:9
papers [1] - 11:12
parade [1] - 5:24
particular [3] - 7:12, 7:16, 7:17
pattern [1] - 9:12
payment [1] - 7:13
people [1] - 5:17
per [1] - 5:17
perceive [1] - 6:4
percolate [1] - 13:22
percolating [1] - 13:20
perfect [1] - 14:9
perhaps [1] - 3:22
period [1] - 7:14
permanent [6] - 4:14, 7:9, 7:11, 7:15, 10:13, 10:15
phrase [1] - 8:18
physical [20] - 4:2, 4:11, 4:13, 4:16, 5:12, 5:14, 6:5, 6:18, 8:17, 8:20, 8:23, 9:7, 9:18,

9:24, 10:5, 10:13, 11:7, 11:14, 11:22, 13:3
PLAINTIFF [2] - 1:5, 2:3
plaintiff [15] - 3:8, 3:10, 3:19, 4:15, 8:21, 9:21, 10:8, 10:11, 10:18, 10:20, 13:3, 13:5, 13:9, 13:10
Plaintiff [1] - 1:6
plaintiff's [12] - 5:18, 8:13, 8:16, 8:24, 9:16, 9:24, 10:1, 11:15, 11:19, 11:24, 12:17, 13:1
plaintiffs [3] - 9:23, 11:20, 12:25
Plan [4] - 3:6, 3:9, 4:1, 4:23
plausibly [1] - 10:5
PLF [6] - 2:4, 2:4, 2:5, 2:6
point [13] - 3:25, 6:2, 6:3, 7:18, 7:21, 7:22, 8:10, 8:16, 9:4, 10:4, 11:24, 12:5, 12:7
points [4] - 3:19, 4:7, 8:5, 8:8
policies [2] - 5:1, 10:12
policy [10] - 4:4, 5:6, 5:9, 5:11, 5:22, 7:12, 8:17, 11:13, 11:20
policyholder [4] - 9:9, 9:16, 9:19, 11:8
policyholder's [2] - 9:1, 9:2
popular [1] - 6:12
possession [1] - 10:17
possibly [1] - 12:25
precedent [1] - 4:6
prejudice [5] - 12:22, 12:24, 13:8, 13:16, 14:21
premises [7] - 5:19, 8:22, 8:24, 9:1, 9:17, 9:23, 13:2
presume [1] - 3:14
previous [1] - 4:9
problem [1] - 14:20
problems [1] - 14:24
proceeding [1] - 1:12
proceedings [2] - 15:6, 16:11
profitability [1] - 9:3
property [17] - 4:3, 5:15, 6:13, 8:20, 8:21,

8:25, 9:18, 9:20, 9:25, 10:6, 10:13, 10:14, 10:15, 11:7, 11:15, 11:23, 13:4
provide [1] - 5:1
proximate [2] - 7:23, 12:1
pursuant [1] - 16:9
put [5] - 4:15, 5:22, 14:7, 14:11, 14:16

**Q**

questions [1] - 12:6
quite [1] - 6:25

**R**

raised [2] - 8:13, 14:24
read [1] - 13:14
reading [1] - 6:18
really [4] - 4:7, 6:3, 7:9, 14:9
Realtime [1] - 16:6
reason [1] - 12:24
reasonable [2] - 4:16, 6:12
recently [1] - 10:25
reconsider [1] - 3:22
reduces [1] - 9:2
referring [1] - 5:4
regard [2] - 9:24, 10:9
regarding [3] - 3:21, 5:4, 5:10
regardless [1] - 8:4
regulations [1] - 16:13
rejected [2] - 10:8, 11:14
related [1] - 11:9
relied [1] - 10:11
relies [1] - 10:20
relying [1] - 9:23
remained [1] - 10:16
reported [1] - 16:11
REPORTER [2] - 1:22, 16:1
Reporter [1] - 16:7, 16:20
REPORTER'S [1] - 1:12
represent [1] - 8:14
require [1] - 5:12
required [1] - 7:11
requirement [2] - 9:8, 11:7
respect [3] - 8:16, 10:1, 11:24

respond [2] - 13:14, 14:2
responders [1] - 6:15
response [3] - 7:5, 8:12, 11:19
responses [1] - 8:8
responsible [2] - 5:25, 8:25
restaurant [6] - 10:4, 10:14, 10:16, 10:20, 11:17
restaurants [3] - 5:5, 8:4, 11:18
restoration [1] - 7:14
result [2] - 14:10, 16:9
ripe [1] - 14:21
risk [2] - 4:4, 5:21
ROOM [1] - 1:23
room [1] - 10:17
RPR [1] - 16:20
ruling [5] - 8:19, 9:13, 10:24, 14:4, 14:5

**S**

safe [1] - 15:3
safeguards [1] - 5:11
satisfy [1] - 11:6
scenario [4] - 4:9, 5:3, 5:8, 5:10
Sea [1] - 11:2
second [2] - 6:3, 10:1
Section [1] - 16:9
see [2] - 12:25, 14:23
sense [3] - 6:11, 6:13, 7:12
separate [2] - 4:2, 4:20
September [1] - 1:13
series [1] - 4:22
set [1] - 8:18
sets [1] - 4:22
shared [1] - 10:23
shows [1] - 9:12
shut [1] - 8:4
side [1] - 7:24
sides [1] - 3:14
situation [1] - 6:9
situations [2] - 5:12, 5:24
snow [1] - 5:9
snowstorm [1] - 5:8
social [4] - 10:6, 10:19, 11:9, 11:16
sort [5] - 5:4, 5:23, 6:3, 6:11, 13:6
sought [1] - 9:9

sound [1] - 6:10
sounds [1] - 6:12
specific [1] - 5:2
specifically [2] - 4:8, 9:13
specifics [1] - 12:14
standard [1] - 4:16
STATE [1] - 16:4
state [1] - 8:1
STATES [1] - 1:1
states [1] - 8:3
States [3] - 16:7, 16:9, 16:14
stay [1] - 15:2
stemming [2] - 9:9, 10:7
stenographically [1] - 16:11
still [2] - 7:19, 10:20
STREET [1] - 1:23
Studio [1] - 9:5
subject [1] - 12:18
submit [1] - 5:25
suffered [2] - 9:17, 10:5
SUITE [3] - 2:5, 2:10, 2:15
Superior [2] - 11:3, 11:5
supplemental [2] - 7:5, 11:19
surplus [1] - 6:20
suspended [1] - 11:8
sustained [1] - 11:5

**T**

t-eed [1] - 7:2
table [1] - 5:17
takeout [1] - 10:21
tangible [3] - 4:11, 4:14, 8:21
team [1] - 13:25
temporary [1] - 7:15
ten [2] - 14:7, 14:8
Ten [5] - 6:23, 7:4, 10:2, 10:3, 10:22
tentative [18] - 3:14, 3:21, 4:10, 4:22, 5:3, 5:10, 5:16, 6:3, 7:1, 7:7, 7:19, 7:23, 8:19, 9:13, 10:24, 11:1, 12:21, 14:25
TERRI [4] - 1:22, 16:6, 16:19, 16:20
texting [1] - 13:25
THE [22] - 2:3, 2:8, 2:13, 3:6, 3:11, 3:13, 3:17, 3:20, 3:24, 8:7, 12:5, 12:17, 12:20,

13:9, 13:18, 13:21,
14:3, 14:11, 14:14,
14:16, 14:19, 15:2
  **theory** [2] - 13:1,
13:5
  **therefore** [1] - 8:23
  **thinking** [4] - 13:11,
13:21, 13:22, 13:25
  **third** [2] - 7:18, 11:24
  **Thursday** [1] - 14:13
  **TIME** [2] - 1:13, 3:2
  **Title** [1] - 16:9
  **today** [1] - 13:13
  **together** [1] - 4:21
  **topic** [1] - 12:15
  **total** [2] - 5:23, 7:9
  **Total** [1] - 10:10
  **transcript** [2] -
16:10, 16:12
  **TRANSCRIPT** [1] -
1:12
  **treatises** [1] - 8:19
  **triggering** [5] - 6:6,
6:8, 6:11, 6:19
  **troubling** [1] - 6:1
  **true** [1] - 16:10
  **try** [2] - 13:5, 14:23
  **two** [8] - 4:7, 5:3,
11:12, 11:18, 12:6,
13:12, 14:12
  **Type** [1] - 1:12
  **type** [1] - 12:11
  **types** [2] - 5:12, 12:8

## U

  **U.S** [1] - 1:3
  **unanticipated** [1] -
5:24
  **under** [4] - 4:18,
4:23, 8:19, 9:25
  **United** [3] - 16:7,
16:9, 16:14
  **UNITED** [1] - 1:1
  **unlike** [1] - 9:14
  **up** [4] - 6:24, 7:2,
13:20, 13:22

## V

  **versus** [2] - 3:7, 11:2
  **view** [2] - 13:2, 13:7
  **views** [2] - 10:23,
14:6
  **virus** [7] - 7:25, 8:9,
9:14, 9:21, 9:22,
11:25, 13:6
  **vs** [1] - 1:7

## W

  **waiting** [1] - 14:18
  **wants** [1] - 12:2
  **waste** [1] - 12:3
  **watch** [1] - 6:13
  **wear** [1] - 10:17
  **week** [3] - 14:7, 14:8,
14:12
  **WEST** [1] - 1:23
  **WESTERN** [1] - 1:2
  **Wilson** [5] - 10:8,
10:10, 10:12, 10:16,
11:1
  **Wilson's** [1] - 10:3
  **withhold** [2] - 14:4,
14:5
  **word** [11] - 6:5, 6:6,
6:8, 6:13, 6:18, 6:20,
6:21, 6:23, 10:9
  **words** [1] - 9:19
  **wrongly** [1] - 7:8
  **WU** [1] - 1:3

## X

  **XXX** [3] - 2:11, 2:16
  **XXX-XXXX** [2] - 2:11,
2:16
  **XXXX** [2] - 2:11, 2:16

## Z

  **ZIP** [3] - 2:6, 2:11,
2:16

**UNITED  STATES  DISTRICT  COURT**

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UMAMI PITTSBURGH, LLC** d/b/a/<br>UMAMI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    2:20cv999 |
| | )    **Electronic Filing** |
| **MOTORISTS COMMERCIAL** | ) |
| **MUTUAL INSURANCE COMPANY,** | ) |
| | ) |
| Defendant. | ) |

## ORDER OF COURT

AND NOW, this 9th day of September, 2020, upon consideration of the Motion for

Reconsideration and Amendment of Remand Order (**Document No. 18**) filed on behalf of

Defendant, Motorists Commercial Mutual Insurance Company, and Plaintiff's response thereto,

the Clerk of Court having sent a certified copy of the Remand Order to the Court of Common

Pleas of Allegheny County, Pennsylvania on September 1, 2020,

IT IS HEREBY ORDERED that the Motion is **GRANTED**, and this Court's Order dated

August 26, 2020, (**Document No. 17**) is amended as follows:

1.     The Order of Remand and the service of such Order on the Prothonotary of the

Court of Common Pleas of Allegheny County does not divest this Court of jurisdiction; and

2.     Jurisdiction over this matter remains with this Court pending any appeal of such

Order to the United States Court of Appeals for the Third Circuit.

s/ DAVID STEWART CERCONE
David Stewart Cercone
Senior United States District Judge

cc:   James C. Haggerty, Esquire
      John P. Goodrich, Esquire
      Jonathan Shub, Esquire
      Scott B. Cooper, Esquire
      Matthew A. Meyers, Esquire

*(Via CM/ECF Electronic Mail)*

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DIANOIA'S EATERY, LLC d/b/a
DIANOIA'S and PIZZERIA DAVIDE,

        Plaintiff,

    v.

MOTORISTS MUTUAL INSURANCE
COMPANY,

        Defendant.

Civil Action No. 2:20-cv-00787-NBF

Hon. Nora Barry Fischer

<u>**MOTION FOR RECONSIDERATION AND AMENDMENT OF REMAND ORDER**</u>

       NOW, comes Defendant, Motorists Commercial Mutual Insurance Company ("Motorists"), by and through its attorneys, BURNS WHITE LLC, and files this Motion for Reconsideration and Amendment of Remand Order.

       1.     The instant matter relates to Plaintiff's claim for insurance coverage for damage and loss allegedly caused by the COVID-19 virus, pandemic, and related governmental orders. (<u>See</u> Compl. [Doc. 1-1], *generally*.)

       2.     Plaintiff filed its action in the Court of Common Pleas of Allegheny County, and Motorists Removed the action to this Court based on the Court's diversity jurisdiction. (<u>See</u> Compl. [Doc. 1-1], *generally*; Notice of Removal [Doc. 1], *generally*.)

       3.     Plaintiff has conceded diversity and has not challenged the amount in controversy. (<u>See</u> Mot. to Remand [Doc. 8] ¶ 4, *generally*.)

       4.     By its Motion to Remand, Plaintiff sought to have this Court decline to exercise its jurisdiction, arguing that the Court's jurisdiction is discretionary. (<u>See</u> Mot. to Remand [Doc. 8] ¶¶ 28-33.)

5. On August 27, 2020, by its Remand Order, the Court granted Plaintiff's Motion to Remand, declining to exercise its jurisdiction pursuant to the Declaratory Judgment Act ("DJA"). (See Order, Aug. 27, 2020 [Doc. 19], pp. 1-2.)

6. In doing so, the Court remanded the action to the Court of Common Pleas of Allegheny County, and ordered the Clerk of Courts to close the case and serve a certified copy of the Court's Order on the Prothonotary. (Id., p. 2.)

7. Motorists submits that in so doing the Court has prematurely ordered the remand and closing of the federal court action, inconsistent with the continuing jurisdiction of the federal courts and Motorists' right to appeal, irrespective of the status of any certified order to the Court of Common Pleas of Allegheny County.

8. The Court's Remand Order predicated on the declination of discretionary jurisdiction is appealable to the Third Circuit. Reifer v. Westport Ins. Corp., 751 F.3d 129 (3d Cir. 2014).

9. For the reasons more fully set forth in Motorists' Brief, which is incorporated herein by reference, neither the Remand Order predicated on the declination of discretionary jurisdiction (to which 28 U.S.C. § 1447(d) is inapplicable), nor the mailing of the remand order divests the district court of jurisdiction. See Reifer, supra, Quackenbush v. Allstate Insurance Co., 517 U.S. 706, 713–15, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996), In re U.S. Healthcare, 159 F.3d 142, 146 (3d Cir.1998), Rarick v. Federated Service Insurance Company, 2:13-cv-03286 (Order, March 4, 2016) (Order and Docket Excerpt attached hereto at Exhibits 1 & 2), Hudson United Bank v. LiTenda Mortg. Corp., 142 F.3d 151, 158 (3d Cir. 1998), J.O. v. Alton Community Unit Sch. Dist. 11, 909 F.2d 267, 273–274 (7th Cir.1990).

WHEREFORE, where the Court's Remand Order remains subject to appeal to the Third Circuit, § 1447(d) is inapplicable, and the Court retains jurisdiction following the entry of a remand order founded on discretionary jurisdiction pursuant to the DJA, Motorists respectfully requests that the Court amend its order and/or enter an Order consistent with Motorists proposed order directing the Clerk of Courts to refrain from remanding this matter and sending the Remand Order to the Allegheny County Prothonotary and clarifying that jurisdiction remains with the district court pending appeal.

Respectfully submitted,

BURNS WHITE LLC

By: /s/ Matthew A. Meyers
    Matthew A. Meyers (PA I.D. 202838)
    E-mail: mameyers@burnswhite.com
    Robert E. Dapper, Jr. (PA I.D. 46378)
    E-mail: redapper@burnswhite.com
    Taylor M. Davis (PA I.D. 327312)
    E-mail: tmdavis@burnswhite.com
    Burns White Center
    48 26th Street
    Pittsburgh, PA 15222
    (412) 995-3281 – Direct
    (412) 995-3300 – Fax
    *Attorneys for Defendant, Motorists*
    *Commercial Mutual Insurance Company*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that on August 28, 2020, the within **MOTION FOR RECONSIDERATION AND AMENDMENT OF REMAND ORDER** was filed electronically and will be served upon all counsel via the Court's ECF System. The Parties may access this filing through the Court's system.

JAMES C. HAGGERTY, Esquire
jhaggerty@hgsklawyers.com
HAGGERTY, GOLDBERG, SCHLEIFER &
KUPERSMITH, P.C.
1835 Market Street, Suite 2700
Philadelphia, PA 19103

SCOTT B. COOPER, Esquire
scooper@schmidtkramer.com
SCHMIDT KRAMER, P.C.
209 State Street
Harrisburg, PA 17101

JOHN P. GOODRICH, Esquire
jack@goodrichpc.com
LAUREN R. NICHOLS, Esquire
lauren@goodrichpc.com
GOODRICH and ASSOCIATES, P.C.
429 Fourth Avenue, Suite 900
Pittsburgh, PA 15219

JONATHAN SHUB, Esquire
jshub@shublawyers.com
SHUB LAW, LLC
134 Kings Highway E., 2nd Floor
Haddonfield, NJ 08033

*Attorneys for Plaintiff*

/s/ Matthew A. Meyers
Matthew A. Meyers

# Exhibit D

2020 WL 4592718
Only the Westlaw citation is currently available.
United States District Court, S.D.
Indiana, Indianapolis Division.

CAFE PATACHOU AT CLAY TERRACE, LLC,
Monon Holding, LLC, Napolese at 30 South, LLC,
Napolese of Keystone Crossing, LLC, Napolese,
LLC, Patachou, Inc., Patachou at 49th and Penn,
LLC, Patachou at Hazel Dell, LLC, Patachou on
the Park, LLC, Patachou Provisions, LLC, Petite
Chou at Broad Ripple, LLC, Public Greens CHQ,
LLC, Public Greens Fashion Mall, LLC, Plaintiffs,
v.
CITIZENS INSURANCE COMPANY
OF AMERICA, Defendant.

No. 1:20-cv-01462-SEB-DLP
|
Signed 08/11/2020

**Attorneys and Law Firms**

Christopher Edward Kozak, George M. Plews, Gregory M.
Gotwald, Ryan Taylor Leagre, Plews Shadley Racher &
Braun LLP, Indianapolis, IN, for Plaintiffs.

Todd Stewart Schenk, Tressler Soderstrom Maloney &
Priess, William K. McVisk, Tressler LLP, Chicago, IL, for
Defendant.

**ORDER DENYING PLAINTIFFS'
MOTION TO REMAND**

SARAH EVANS BARKER, JUDGE

 **\*1** This cause is before the Court on Plaintiffs' Motion to
Remand [Docket No. 11], filed on June 19, 2020. Plaintiffs,
collectively referred to as "Patachou," are the owners
and operators of twelve restaurants based in Carmel and
Indianapolis, Indiana. Compl. ¶¶ 2-14. Patachou has brought
a declaratory judgment action, originally filed in Marion
Commercial Court (Indiana) against Defendant, Citizens
Insurance Company of America ("Citizens"), seeking "a
judgment declaring the scope of Citizens' obligation to pay
Patachou's losses under a commercial property insurance
policy related to the novel coronavirus and COVID-19
pandemic." *Id.* ¶ 1. Citizens subsequently removed the case

to this court based on diversity jurisdiction regarding which
Plaintiff has sought a remand. For the reasons detailed below,
we DENY Plaintiffs' Motion to Remand.

**Factual Background**

As the seriousness of the COVID-19 pandemic became
increasingly apparent in March 2020, Indiana Governor Eric
Holcomb issued a series of executive orders with the goal of
slowing the spread of the virus. *Id.* ¶¶ 26-30. Pursuant to that
governmental strategy, on March 16, 2020, Gov. Holcomb
issued Executive Order 20-04, which temporarily closed
all restaurants, bars, and nightclubs to in-person patrons,
but allowed them to provide take-out and delivery services
to their customers. *Id.* ¶ 26. A week later, on March 23,
2020, Executive Order 20-08 ordered all individuals living
in Indiana to stay at home through at least April 6, 2020, [1]
with limited exceptions. *Id.* ¶ 28. Under this stay at home
order, restaurants were permitted to continue to provide take-
out and delivery services, but food sold under this exemption
could not be eaten at the site "due to the virus's propensity to
physically impact surfaces and personal property." *Id.* ¶ 28.

Patachou operates twelve restaurants in Carmel and
Indianapolis, [2] and was required to close eleven of them
during the week following issuance of Executive Order 20-04.
*Id.* ¶¶ 18, 27. Patachou is insured by Citizens under a
commercial property policy, and takes the view that "the
policy provides coverage for the losses suffered by Patachou
when it was forced to close its restaurants, including the
loss of 'Business Income' sustained due to the necessary
'suspension' of Patachou's 'operations.' " *Id.* ¶¶ 31-32.
Specifically, Patachou maintains that its losses are covered
by the Business Income and Extra Expenses Coverage Form
portion of the Policy, which provides:

> We will pay for the actual loss of
> Business Income you sustain due
> to the necessary "suspension" of
> your "operations" during the "period
> of restoration". The "suspension"
> must be caused by direct physical
> loss of or damage to property at
> "premises" which are described in the
> Declarations. The loss or damage must

be caused by or result from a Covered
Cause of Loss.

*Id.* ¶ 38. On March 20, 2020, Patachou submitted a claim for loss under the insurance policy, but Citizens has denied the claim. *Id.* ¶¶ 34-35.

**\*2** Patachou subsequently initiated this lawsuit in Marion Commercial Court (Indiana) seeking declaratory relief pursuant to Indiana Code § 34-14-1-1 and Rule 57 of the Indiana Rules of Trial Procedure. *Id.* ¶ 42. Citizens, a Michigan corporation, *id.* ¶ 15, timely removed the lawsuit to this court based on diversity jurisdiction under 28 U.S.C. § 1332. Patachou does not contest that the Parties are citizens of different states or that the amount in controversy exceeds $75,000 exclusive of interests and costs. *See* Pls.' Br. Supp. Mot. Remand. Nevertheless, Patachou filed a Motion to Remand contending that this court should decline to exercise jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* ("DJA"), pursuant to its discretionary powers on the grounds that this case presents novel state-law issues more appropriately addressed and resolved by a state tribunal. We address this contention below.

## Legal Analysis

### I. Standard of Review

The federal removal statute, 28 U.S.C. § 1441(a), "permits a defendant to remove a civil action from state court when a district court has original jurisdiction over the action." *Micrometl Corp. v. Tranzact Techs., Inc.*, 656 F.3d 467, 470 (7th Cir. 2011). "Courts should interpret the removal statute narrowly and presume that the plaintiff may choose his or her forum." *Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 911 (7th Cir. 1993) (citations omitted). Therefore, in deciding whether to remand a case, courts "must resolve any doubts about jurisdiction in favor of remand." *D.C. v. Abbot Labs. Inc.*, 323 F. Supp. 3d 991, 993 (N.D. Ill. 2018) (citing *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 758 (7th Cir. 2009)).

### II. Discussion

We begin by noting that removal of this case was indisputably proper given our clearly established diversity jurisdiction. It could have originated in this court, and Patachou

acknowledges as much when it does not contest that the requirements for diversity jurisdiction are met. Complete diversity among the parties coupled with the amount in controversy which exceeds $75,000 exclusive of interests and costs have been established.

Patachou nonetheless seeks a remand of the case arguing that the questions presented involve important matters of state law and that the Declaratory Judgment Act ("DJA") gives the court discretion to decline to hear such a case even where the court otherwise would have a "virtually unflagging obligation ... to exercise the jurisdiction given [to it]." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Citizens responds by noting that there is no parallel state court action; therefore, it would be improper for the Court not to exercise jurisdiction. Citizens also argues that while some of the factual circumstances in this case are novel, the legal issues presented are not. We agree with Citizens's assertions and therefore deny Patachou's motion to remand.

The DJA invests district courts with discretion to declare the rights of litigants. *See* 28 U.S.C. § 2201(a); *Medical Assur. Co. v. Hellman*, 610 F.3d 371, 377-78 (7th Cir. 2010). Discretion also exists under the DJA according to which a district court may decline to hear certain cases. *Hellman*, 610 F.3d at 379. In this context, "the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995). However, "[a]lthough district courts enjoy some discretion over requests for declaratory judgments, that discretion is not unlimited." *Hellman*, 610 F.3d at 373. "[I]f the declaratory judgment will clarify and settle the disputed legal relationships and afford relief from the uncertainty and controversy that created the issues, it is usually resolved rather than dismissed." *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 578 (7th Cir. 1994) (citation omitted).

**\*3** So far as we have been informed, this case does not involve a related or "parallel" proceeding pending in state court. In other DJA cases, the existence of a parallel or related state proceeding often gives rise to concerns of comity and efficiency. *See, e.g., Medical Assur. Co. v. Hellman*, 610 F.3d at 378-80; *Nationwide Ins. v. Zavalis*, 52 F.3d

689, 692-94 (7th Cir. 1995). Citizens argues that Seventh Circuit jurisprudence requires retention in the absence of a parallel state proceeding; however, as Patachou rejoins, the Seventh Circuit has stated that "[e]ven if there is no parallel proceeding, the district court still has discretion to decline to hear a declaratory judgment suit." Hellman, 610 F.3d at 379 (citations omitted).

The Seventh Circuit's decisions in *Helman* and *Zavalis* suggest that exercising jurisdiction is generally appropriate when the federal proceeding would not interfere with a related state court proceeding. See Hellman, 610 F.3d at 381-82 (holding that district court abused its discretion when it stayed a declaratory judgment action that was "sufficiently distinct from the issues that have arisen thus far in the state proceedings"); Zavalis, 52 F.3d at 693, 695, 697 (affirming in part district court's decision to dismiss request for declaration as to duty to indemnify because "resolution of that duty would necessarily require it to address a factual question at the heart of the University's state court action," but vacating in part and remanding as to district court's dismissal of request as to duty to defend because "that duty can be ascertained without the need to resolve facts that are at issue in the underlying tort suit"). Because, clearly, an adjudication in the federal proceeding will never interfere with the state court proceeding when no related state court action exists, concerns about comity and duplicative litigation are less present in such cases. Thus, the absence of a related state action, though not dispositive, weighs in favor of retention. Sherwin-Williams Co. v. Holmes County, 343 F.3d 383, 392-394 (5th Cir. 2003).

We turn next to the other factors a district court is directed to consider when determining whether to hear a case under the DJA. See Zavalis, 52 F.3d at 692. In *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, the Seventh Circuit laid out the following five considerations:

(1) whether the judgment would settle the controversy;

(2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;

(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";

(4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction, and

(5) whether there is an alternative remedy that is better or more effective.

28 F.3d at 579 (quoting Nationwide Mut. Fire Ins. Co. v. Willenbrink, 924 F.2d 104, 105 (6th Cir. 1991)). Patachou does not argue that the judgment would not settle the controversy or that Citizens has engaged in "procedural fencing." Rather, Patachou asserts that the other three factors weigh in favor of remand, primarily because the issues presented are state law issues ostensibly of first impression.

According to Patachou, the judgment would not serve a useful purpose in clarifying the legal relations at issue, because "it would encroach on the state courts' responsibility to determine Indiana law [on matters of first impression]." Pls.' Br. Supp. Mot. Remand, at 7-8. Similarly, Patachou argues that because "[n]o Indiana court has decided a case about insurance coverage in COVID-19 cases," it would encroach upon state jurisdiction and increase the friction between federal and state courts if this court were to exercise jurisdiction. *Id.* at 9.

 **\*4**  As we have acknowledged, the factual circumstances of this case may be novel, but in our view Citizens is quite right in stating that "State and federal courts in Indiana have regularly interpreted insurance policies and applied them to specific fact patterns." Def.'s Resp. Opp'n Pls.' Mot. Remand, at 10. "[A]n insurance policy is a contract and subject to the normal analysis accorded contractual language used in other contracts." Hartford Cas. Ins. Co. v. Evansville Vanderburgh Public Library, 860 N.E.2d 636, 645 (Ind. Ct. App. 2007) (citing Morris v. Econ. Fire & Cas. Co., 848 N.E.2d 663, 666 (Ind. 2006)). Federal courts regularly interpret such contracts under the laws of Indiana in a myriad of factual scenarios. See, e.g., G&S Metal Consultants, Inc. v. Cont'l Cas. Co., 200 F. Supp. 3d 760 (N.D. Ind. 2016); Advanced Radiant Sys., Inc. v. Peerless Indem. Ins. Co., No. 1:14-cv-01943-JMS-DML, 2016 WL 1117759, at *1 (S.D. Ind. March 22, 2016); Ports of Indiana v. Lexington Ins. Co., 2011 WL 5523419, at *1 (S.D. Ind. Nov. 14, 2011). Moreover, even if the questions were novel, "this Court is also capable of deciding novel and complex state law issues." Lusher Site Remediation Grp. v. Nat'l Fire Ins. Co. of Hartford, No. 1:18-cv-03785-JRS-DLP, 2019 WL 3811926, at *1, 2 (S.D. Ind.

Aug. 14, 2019). A declaratory judgment in this case would clarify the legal relations at issue by determining the scope of Citizens's obligations under the insurance policy, and that judgment would not encroach upon state court jurisdiction any more than any other diversity case.

Finally, Patachou argues that remand is preferable because the remedy handed down by a federal court would be less effective than a declaratory judgment issued by a state court, because, if the case proceeds to federal appellate review, the scope of review will likely be limited to "the law under the same *Erie* framework as (would be applied by) this Court." Pls.' Br. Supp. Mot. Remand, at 9-10. Of course, this is true of any decision by a federal court sitting in diversity. Whatever strategic preferences Patachou may have regarding an appeal in state court, it's right to appeal in federal court—including by seeking certification to the Indiana Supreme Court—is unimpaired. Pls.' Br. Supp. Mot. Remand, at 10-11. We are not persuaded that this reason suffices to justify a decision that we should or must decline to exercise federal diversity jurisdiction.

## Conclusion

We hold that a judgment in this case would clarify the legal obligations of the Parties and not intrude upon any related state court action; therefore, we find no reason to exercise the discretion afforded by the DJA to decline to hear the case.

This court has diversity jurisdiction under 28 U.S.C. § 1332 and removal was accordingly proper. Thus, we DENY Plaintiff's Motion to Remand. [Docket No. 11]. This case shall proceed accordingly.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 4592718

## Footnotes

1    This order was later extended through April 20, 2020.
2    Plaintiff, Patachou, Inc., is the sole member of plaintiffs Cafe Patachou at Clay Terrace, LLC; Monon Holding, LLC; Napolese at 30 South, LLC; Napolese of Keystone Crossing, LLC; Napolese, LLC; Patachou, Inc.; Patachou at 49 and Penn, LLC; Patachou at Hazel Dell, LLC; Patachou on the Park, LLC; Patachou Provisions, LLC; Petite Chou at Broad Ripple, LLC; Public Greens CHQ, LLC; and Public Greens Fashion Mall LLC. *Id.* ¶¶ 2-14.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.